at 20-4017 and 20-4019. Before we start, I did have a question for the appellants. Were you planning to split the time equally or did you have some other plan in mind? Your Honor, my plan is to speak for about 10 minutes on behalf of the United States and then turn over to Mr. Williams for two to three minutes and then hopefully to reserve the remaining time for rebuttal. Did you say 12 minutes? So 10 minutes initially for me, two or three minutes for Mr. Williams and then hopefully two minutes for rebuttal at the end. Okay, here's what I'm going to do. This is an important case and a matter of first impression. I'm going to give the U.S. going first 12 minutes if you want it and then the American Samoa can have six minutes if you want it and then the Appalachian can have 18 minutes if you want it so that we give a fair amount of time there and I'll allow two minutes of rebuttal. Thank you, Your Honor. Is that okay? Is that clear? It's the last case so we have some flexibility. All right, so with that, Mr. Hinchelwood, you may proceed. Thank you. Good morning, Your Honors. May it please the Court. Brad Hinchelwood for the United States. In accord with the constitutional text, Congress and the Supreme Court have agreed for more than 100 years, it is for Congress to determine whether and under what circumstances individuals born in American Samoa and other territories will become citizens. Until the district court decision here, no court had ever held that the citizenship clause extends to the territories. The D.C. Circuit has rejected that argument as to American Samoa and four other circuits have rejected the same argument with respect to the Philippines. And that conclusion is especially anomalous here where American Samoa itself has not formed a consensus in favor of U.S. citizenship. But I'd like to start with the constitutional text and sort of walk through some of the provisions that are applicable here. So the territorial clause, the Constitution, draws a distinction between the United States and the territories belonging to it. The Burdine Amendment likewise distinguishes between places within the United States and places that are subject to their jurisdiction. So as other circuits have recognized and the Supreme Court has explained the downs, that indicates that there are places that are subject to the jurisdiction of the United States, but that are not in the United States or part of the United States. The 14th Amendment, by contrast, the citizenship clause is phrased conjunctively. It requires for its application that a person be born both in the United States and subject to the jurisdiction. Similarly, when Congress passed the 15th Amendment, they explicitly distinguished between states and territories. And then other provisions of the Constitution, like the Bankruptcy Clause, Naturalization Clause, and the Tax Uniformity Clause, that use phrases like throughout the United States, do not apply to the territories. We know that, for example, in cases like Downs and Hooven and Allison, which in addressing the Tax Uniformity Clause, there is a clause that states that a person is subject to the jurisdiction of the United States. Go ahead, Judge Nazaro. No, no, no. No, please, Judge. I just want to start with the cases. We have this tension between Wong and the Insular cases. You know, Wong has some persuasive value because it does deal with the 14th Amendment. And why isn't the framework laid out by the Supreme Court in that case, really the roadmap for addressing the issues in this case, as opposed to the Insular cases that go in a different direction? Well, Your Honor, I think everybody recognizes here that that decision involved an individual who was born in a state, born in California after its admission as a state. And there's no question, for purposes of that case, that, you know, Wong Kim Ark was born in the United States. I know the framework discussed, you know, brought in British common law and a lot of other principles. Certainly. But the court was not interpreting and didn't need to interpret what in the United States means for purposes of that clause and how the common law sort of filters into that phrase. And when other courts have considered this question, they've recognized that that type of issue simply wasn't before the court in Wong Kim Ark. And to be sure, there are very broad statements in Wong Kim Ark about, you know, birth within the dominion of the sovereign, et cetera. There's no doubt that those statements are quite broad, but Wong Kim Ark itself recognized that when you have broad statements like that, you have to take them in connection with the specific question in front of the court, which in that case has a doubt. But to some extent, wasn't the Wong court engaged in what we today might call, you know, original public meaning interpretation? And why isn't that an approach that ought to have some valence with the panel? Well, Your Honor, even if it did, I think, again, that phrase in the United States, if you look at the other provisions of the Constitution and the way that states and the United States and the territories are treated differently, I think even that sort of understanding would, you know, suggest that in the United States as a textual matter ought to be treated, you know, you shouldn't necessarily assume that birth anywhere where the United States is ultimately sovereign automatically transfers into citizenship. And that would, in fact, you know, concluding that Wong Kim Ark actually resolves that question, would in fact render, you know, 100 plus years of congressional and Supreme Court practice with respect to the territories, not just wrong, but simply unconstitutional. I mean, Congress consistently addressed by statute, the citizenship of individuals in unincorporated territories. How were people in the territories that existed in 1867, people born in those, in those regions, how were they considered citizens? Your Honor, there's simply not a whole lot of evidence one way or the other on this particular question as the parties have presented it in part because I think the issue simply didn't arise. I mean, as we pointed out in our reply brief, Congress consistently extended the statute to the territories, the incorporated territories that existed, you know, prior to the passage of the 14th Amendment. And so there really just wasn't much sort of an act would have been sort of an academic question, I think, for the most part, whether the 14th Amendment of its own force applied or not. But that also, I would point out, even if you thought that there was some ambiguity or doubt about, you know, how this applies to incorporated territories where Congress has made a judgment that those should become part of the United States, they're on a path for statehood, as Boumediene puts it. Yeah, that's where I wanted to go. What's the principle by which the court can make a decision, a distinction between incorporated territories and unincorporated territories, to the extent that's legally significant? Well, Your Honor, I mean, the Supreme Court has made clear that that distinction exists and is part of our constitutional order, you know, I mean, other than is that continues to govern the United States's relationship with its unincorporated territory. So, you know, you don't necessarily have to decide whether sort of about the status of all territories incorporated and unincorporated to resolve this case. But certainly, as to unincorporated territories, the fact is consistent and it is unambiguous that the Supreme Court and Congress have always recognized that the question of citizenship is addressed by statute. I mean, if you look at, for example, the Supreme Court's decision in Rabang, where it said, you know, it rejected the argument that a person born in the Philippines and who entered the United States during the period where the Philippines was a territory couldn't be treated as an alien under the immigration laws, the court said, absolutely not. Congress had the power when it acquired that territory to decide on what terms it would receive the inhabitants of that territory and what their status was going to be. In fact, legislated that they would be treated as aliens, you know, for these purposes. I'm sorry to interrupt. I do want to back up to Wong Kim Ark. And now it's true that the individual was a Californian, but what about the discussion in interpreting the Tax Uniformity Clause about constitutionalizing the common law? Do you disagree with your adversary's premise that at least that part of Wong Kim Ark was essential to the decision? Sorry, you referred to the Tax Uniformity Clause. I assume you mean the your question. I'm talking about in Wong Kim Ark. Right. You know, whether or not the discussion about the constitutionalizing of the common law, whether that was essential to the decision in Wong Kim Ark. Certainly, as to the question of who counts as being subject to the jurisdiction of the United States, you know, the court obviously looks to the common law and considered how that applied, you know, by mediation of the 14th Amendment. And there's no question that that was, you know, a significant part of the court's analysis. But the court wasn't asked to decide what in the United States meant for those purposes, whether it incorporated every aspect of the common law. And much less was it asked to decide how in the United States applied to territory that Congress acquired by treaty and were not placed on a plenary statehood, were who writes the opinion in Wong Kim Ark is just a few years later, part of the majority in downs. That's, you know, recognizing this principle that Congress gets to make those decisions with respect to newly acquired territories, specifically the territories like the Philippines, like Puerto Rico, that are indistinguishable as a material, you know, materially indistinguishable from American here, and recognize, you know, turn on applied exactly the same principle and events, no doubt that. What about reverse over? Oh, go ahead. No, that's, that's all right. There'll be plenty of time, there'll be plenty of time not to worry. Okay, well, thank you. So let me just ask you about read versus covert. Didn't the Supreme Court say at least in a morality, we shouldn't expand in sort of cases any further than they had, that they had reached? Absolutely, Your Honor. And I think has repeated that, some of that language recently. And so why is that not a problem to your argument? Well, because Your Honor, the specific principles that apply here are not at all an expansion. I mean, I was just discussing Rabang, which the Supreme Court decided in the 1950s in addressing the Philippines and applied exactly the same principle that we're asking the court to apply here, uh, you know, in recognizing that when Congress acquires territory, it is for Congress to decide on what terms to receive their inhabitants and what their status shall be in quotes, uh, you know, Justice Brown's opinion and downs to, to reject the petitioner's claim in that case. And Your Honor, I mean, I think that gets to, you know, one of the broader points here, which is that, you know, the uniform recognition, both by Congress and its statutory practice with respect to the Philippines, Guam, Northern Mariana Islands, the Virgin Islands, um, it would really be a pretty dramatic shift in our understanding of the relationship between the United States and the territories, uh, after, to hold that after this, all this time, in fact, everyone born in the Philippines for, you know, almost 50 years was in fact a U.S. citizen and no one knew it. Um, you know, a pretty remarkable shift in the way we've typically understood, uh, traditionally understood how those relationships function. Judge Nasseri, you had a question? I did. Uh, counsel, I was somewhat persuaded by the fact that the Wong case was decided in 1898, the first of the insular cases, downs in 1901, three years later. It seemed to me that, uh, given the interpretation that Judge Wattops gave to Wong, had the court accepted that, uh, interpretation, it would have not been possible to arrive at the decision in the insular cases. It would have trumped, uh, Wong would have trumped the insular cases and that had to be evident to the Supreme Court. So I found that very persuasive. What troubles me about both your argument and the long-term policy is that I can understand on an interim basis, the Philippines, for example, uh, where the political determination is made to have a decision not to grant citizenship in the territories to be quite appropriate in a congressional decision. Less easy is the proposition that on a long-term basis, a permanent basis, a second class of citizenship or not even non-citizenship, we'll call it, can be created under your argument. That is to say that you could be a citizen or a national, uh, permanently. Is that, is that appropriate? Is that, does the Constitution allow that? Your Honor, it does. And there are a few different things I think I'd like to say in response to that if the court will indulge me the time. I mean, we'll allow as much time as we need to ask our questions. Absolutely. Uh, so a few things about that. One, I mean, just as a, as a, at the level of doctrine, the Supreme Court has never suggested that a territory ceases being unincorporated simply because it's been a territory for a long period of time. So, I mean, Puerto Rico, for example. But you're making, so you're back to Judge Tukovich's point, which is this unincorporated, incorporated distinction, which is a very superficial distinction, it seems to me. It's almost like a, an excuse looking for a cause. Well, Your Honor, I think there's more, there's more to it than that, particularly in this case, where, you know, one of the virtues of that doctrine is that it permits Congress flexibility in how it governs and acquires and relinquishes territory. And, you know, as the Supreme Court recognized, for example, in Sanchez-Valle, that includes the ability to take, you know, approaches to territorial governance that are different or innovative and might not be sort of what we would typically expect within the United States itself. Well, I think you're well, well over, and I don't want to indulge this kind of additional time. Thank you. Thank you. All right. Well, I think, unless Judge Bachrach has another question, let's go to Mr. Williams. Good afternoon. Mr. Chief Justice, and may it please the Court, I represent the democratically elected leaders of American Samoa, and we're here, as you know, to say that we oppose the judicial extension of citizenship to the people of American Samoa. And I'd like to... Counsel, they have changed their mind, correct? The Samoan. At one point, they were aggressively arguing for citizenship. Is that correct? That's incorrect, Judge Lucero. All right. I will say that on the one hand, what you have are snippets of a historical record, you know, the report from 1930, when Senator Bingham was speaking to chiefs on the beach. And what you have in the past 60 years, which I'd say is more probative and more relevant for your consideration, is 60 years ago, the American Samoan people promulgated their constitution under the auspices of the United States. And in that constitution, this was a literal constitutional moment. They included in that constitution specific protections for the Samoan way of life, fa'a Samoa. What they did not do was seek citizenship. What they did not insist upon was greater recognition as part of the United States. But what they bargained for with the United States and the United States Congress then was for a system of democratically elected government. And since that time, your honors, the history of the relationship between the United States and American Samoa is one of great pride, to be sure, but also of increasing recognition of the self-determination rights of the American Samoan people. And this was... Counsel, if I may, please, very quickly. Are you saying to us that the Samoan populace has never sought U.S. citizenship, qua citizenship? It depends on how you define populace, Judge Lucero. I don't want to argue. I'm just trying to find... I'm with you. I'm just trying to find out historically whether the Samoan population, the majority thereof, has ever sought U.S. citizenship. And are you... First, answer that question. And then the second question is, are you saying we want to throw the key away and forever we do not want U.S. citizenship? Or are you, third question, saying we'd like to decide by a majority of votes whether we want to be U.S. citizens? If you'd answer those in sequence, please. On the first, the answer is no, Your Honor. There is no evidence in this record that a majority of people of American Samoa have ever stated that they want to be U.S. citizens. Thank you. That's very important to me. Second question. On the second question, no, Your Honor. The American Samoan people are not saying throw away the key. What they're saying is, is right now there's a structure in place that happens to be the constitutional structure that gives the American Samoan people a voice in what their choices will be. So rather than waking up one morning and finding out their citizenship status has changed because of what a judge has done... I understand. Third question, please. Third question, should there be participatory... Should it be a decision of your population, of your client's population, by majority vote? Whether it's by majority vote or by consensus or whatever procedures... Yes, the answer is yes, Your Honor. And I'd like to talk about what the current status is because I think this is important. The American Samoan people have not developed a consensus in favor of citizenship. This has been an issue of great fundamental importance. There are people listening on the radio to this argument right now because it's that important to them in American Samoa. But since 2012, when the Tuaua case was filed in the DDC, this has been an issue that's been at the forefront of American Samoans' minds and their governments, both the American Samoan government, the governor, the congresswoman from American Samoa, have been resoundingly re-elected. Congressman Amata with 83 percent of the vote in her last election. As recently as this year, the American Samoan Fono, their legislature, issued a resolution saying we do not want the extension of birthright citizenship. This should be part of the ongoing development, which has created this status, which I promised. Right now, the American Samoan people have a degree of self-determination and they'd like to decide what they want in a way that protects their culture. But at the same time, individuals from American Samoa have not only a path to citizenship, but a glide path to citizenship. And that's in part due to Congresswoman Amata's work, where they have an expedited path to citizenship if they choose to take it once they reside in a state of the union and leave American Samoa. So this is an approach. I see. So they have a path to citizenship if they leave Samoa. Well, if they become a resident of another state, Your Honor. Yeah, I define that as leaving Samoa. Look, I just want to make sure that I don't think courts should impose citizenship on anyone. But I do want to be assured that what you're asserting is that Samoans living in Samoa do not wish to be U.S. citizens under some kind of constitutional argument, but rather want to take it on the basis of some level of self-determination, that that essentially is a position, a defensible position of the people of Samoa. Your Honor, that's not only a defensible position. That's why I'm standing here. And I'd like to very quickly make two points on that. The first being that I represent the only democratically elected leaders of American Samoa, Your Honor. So there is a lawful, fair way for them to have a voice. And I am representing the people both in Washington and Palo Palo who have that voice. And the second point, and I'll go very quickly, is other territories have made just these sorts of decisions. So we've spoken about the Philippines, which has independence through the Treaty of Manila, but also the federated states of Micronesia. They made a decision that not only do they not want citizenship, but they want an arm's length relationship with the United States. They have a compact. They still get federal aid. The Commonwealth of the Northern Marianas Islands said, we don't want a loosey-goosey unincorporated status. We want Commonwealth status that includes citizenship. So they negotiated with the United States for that. And the American Samoa government might continue on an arc like that. It's fortunate that the Congress has given greater respect to their self-determination rights. And they view Judge Waddup's decision, not just as a step in the wrong direction, but as throwing those rights out the door, Your Honor. And I feel badly for going over on my time, but I'd like to answer any questions that Your Honors have. Thank you, counsel. Judge Bacharach, any follow-up? I do have one question, Mr. Williams. And that is, assuming that we agree with you in the D.C. Circuit about the wisdom of leaving this very difficult and important issue to the elected officials in American Samoa. As Chief Judge Tepcovich was alluding to, when the 14th Amendment, Section 1, was adopted and ratified, it meant whatever it meant. Why should our personal views or ideological views about who should be making this decision, why should that trump the meaning of the Constitution? After all, one could make the same argument that you did in support of the Dred Scott decision. And that is that individuals were, their citizenship should be determined based on what the southern states had adopted, because those were democratically elected state officials. Why is the, to use the D.C. Circuit's language, the anomaly, why should that bear on our constitutional interpretation? Right. So, and first, and Judge Bacharach, I know that this wasn't intended, but of course, I'd reject any comparison between the people. Of course. Of course. They're a colony trying to preserve their culture, and that's very different from Jim Crow. But with that said, I turn to Justice Kennedy's remarks in Boumediene, which is the Supreme Court's most recent pronouncement on the Insular Cases, where Justice Kennedy noted, these sorts of decisions, this sort of framework, turns on practicality and not on formalities. So we have a situation where, before American Samoans agreed to the deed of session, decades before, there was a decision in Wong Kim Ark that appears to have been significantly undercut, as the Chief Judge had pointed out, in Downs versus Bidwell, by essentially the same court. Maybe it's an academic matter to say, with the lenses of today, whether in retrospect, we'd reach back to 1866. But Your Honor, we have a framework that's both enshrined in Supreme Court precedent. Despite the reprehensible language in the Insular Cases, it's created a framework that not only have courts of appeals relied on, and that is five different courts of appeals that have ruled our way on just this issue, but also, as I'm saying, the territories have relied on. Because the federated state of Micronesia, over the past six years, the past hundred years, this is something that has become constitutional. I agree with the government's arguments about the has been put on a system that might not always be reflected in Supreme Court precedent, though it is, or court of appeals precedent, which certainly is, as recently as 2016. But in the Department of State, the Department of Interior, and territorial governments themselves who need to make these decisions about their status. I hope that answered your question. Thank you. All right, counsel. Anything else from you, Judge Lucero? Nothing, counsel. Well, let's turn to, you've been very patient, Mr. McGill, but you've had to wait 120 years for this moment, anyway. You may proceed, and I've given you 18 minutes, but we'll be flexible. Thank you, Chief Judge Timkovich, and may it please the court. John Fitisimanu was born under the U.S. flag in the United States territory of American Samoa, yet federal law brands him a modern-day Dred Scott, a citizen, cannot vote. He cannot serve on a jury. Got it. Sorry. Thanks. I'll let you know when to proceed. Thank you, Judge Timkovich. Thank you. I'm ready. Okay, well, that's one of the hazards of Zoom technology. So, anyway, you may continue. As I was saying, Your Honor, John Fitisimanu was born under the U.S. flag in the United States territory of American Samoa, yet federal law brands him a modern-day Dred Scott, a citizen of nowhere. He cannot vote. He cannot serve on a jury, and federal law and his past court declare him to be something less than a citizen. The central and emphatic purpose of the Citizenship Clause was to overrule Dred Scott and to place the question of who is a beyond the legislative power. The government here claims that the clause does not apply to Mr. Fitisimanu or, indeed, to any person born in any territory of the United States since 1868. That would require this court to accept a highly unlikely premise that the Reconstruction Congress intended not to overrule Dred Scott in the territories that then comprised nearly half of its landmass, including nearly all of the 10th Circuit, all of it save Kansas. And, in fact, four years after the 14th Amendment's ratification, the Slaughterhouse Cases said that the Citizenship Clause, in fact, put to rest the question of whether those born in the District of Columbia or the territories were citizens. They were. And that is what demonstrated the essential proposition that one could be a citizen of the United States without being a citizen of any state. Mr. McGill, in these cases, you know, I'm just kind of looking at westward expansion. Didn't Congress kind of clean up the and territories that existed in 1868 and the ones that were acquired subsequently? In other words, that either through the incorporation or through some other statutory device, didn't they clean up the citizenship status in all of those instances? No, Your Honor. So, first of all, the best example is Alaska. Alaska had no statutory provision providing for birthright citizenship until 1940. So, the other unlikely premise here is that you would have to accept is that the Congress that had just purchased Alaska from Russia actually had no rule for birthright citizenship for that whole territory. There was a treaty. Weren't those people extended citizenship? Yes, they were. The inhabitants were. But there was no provision for birthright citizenship for those who were subsequently born. I want to address your question, Judge Tinkovich, about how do we know that the citizenship clause applied to territories in post-1868? I'd say, first, we would look to the Slaughterhouse Cases, which says unquestionably that it was put to rest the question of whether people born in the territories were citizens. Second, I would look to Elk v. Wilkins. The plaintiff there would not have had a case at all if the citizenship clause did not embrace territories. The United States expresses some doubt about whether the court actually knew or not that he was born in Iowa. But Justice Harlan's dissenting opinion on the very first page says he was born within the territory. Did he reference the fact that he had been a resident of the Iowa Territory? No, he did not, Your Honor. Or was he telling from the dissent? Both the majority and the dissent refer to the territorial limits. But I think the fact that both each refers to the territorial limits at least suggests the fact that they had some awareness that he wasn't born in Nebraska, which is where the case was brought. He was born somewhere else. I just want to make sure that my understanding is right. So I understand that there were references in both opinions to the territories. The fact that the plaintiff in that case was born in the Iowa Territory or in any territory, was that in the majority opinion as well? I know it was in the dissent, but I didn't think it was in the majority opinion. It was not, Your Honor. It was not. Thank you. A couple of other points. So the United States's position here is that no person born in any territory of the United States since 1868 benefits from the citizenship clause. And it gets there by through only Downs versus Bidwell. What about the 18th Amendment? Doesn't the 18th Amendment assume that there are parts within the United States that consisting of the territories? What the 18th Amendment certainly does, it bans the manufacture sale of liquor from the United States and all territories subject to its jurisdiction. That, of course, is different from the 13th Amendment, which identified any place subject to its jurisdiction. And the distinction actually carried a difference because the 13th Amendment bans slavery, for instance, in ships at sea, but the 18th Amendment did not. So the other thing I point out, Your Honor, is that the 18th Amendment, of course, postdates the Insular Cases. And to the extent that there was any question about whether the United States could be read to include the territories, it was, of course, wise for Congress to make it clear that this 18th Amendment it was enacting was going to cover the United States and any territory subject to its jurisdiction. Our position is that as a legal matter, because the United States includes all of the territories, what that statute, what that second phrase covers is places like Guantanamo Bay, military bases overseas, places like Lambert Prison in Eisentrager or, as I said, Guantanamo Bay, in addition to embassies abroad and things of that nature. Counsel, if your interpretation, Judge Waddup's interpretation of Wong is correct, that was decided in 1898. Yes. Wouldn't that have been dispositive of the questions presented in the Insular Cases? No, Your Honor, for at least the reason that the Insular Cases, Downs v. Bidwell, presented no question about citizenship. The Insular, Downs v. Bidwell, was purely a question of... But there have been subsequent cases to the Insular Cases in which the Supreme Court has given the interpretation being sought by the appellants here. Oh, absolutely not, Your Honor. There is not, none of the Insular Cases and no decision of the Supreme Court adopts the government's position that, either of the territories generally or unincorporated territories specifically. There is no such decision, but can't my brother... So far, the citizens of Samoa, the population of Samoa, have been citizens all along and they didn't have a clue. Well, Your Honor, I think that would be the consequence of our position, that when the flag was hoisted after the Deed of Session was signed in 1900, the 14th Amendment already was in place. And when, at least when Congress accepted that Deed of Session, they became a territory of the United States and part of the United States, subject to the 14th Amendment. That is undeniably our position. And as we elaborate in the brief, the people of American Samoa were somewhat chagrined to learn that the United States government did not share that view. And I just point you to the sources we have at page six of our brief on that point. I do want to get to your, to the other point, a key point here about your suggestion, Judge Lucero, that the Insular Cases could somehow trump Tuong. So a few responses to that. No, my position, not position, my question was whether Tuong would have trumped the citizen cases. If the population of these unincorporated territories were citizens at the time of their, at the time of the, pardon the term, conquest, then, or change of status by treaty, whichever, that there would be no need for, there would be no other question presented. The issue would be resolved. Your Honor, I want to be as clear as I can about this. There is no, none of the Insular Cases and no other decision of the Supreme Court has a holding with respect to the geographic scope of the citizenship clause. The only cases that address that are in the Courts of Appeals and they misconstrued Wong K. Mark. Let me just, let me ask you this, because it's important to me, as I said to Mr. Williams. Do the citizens of territories under which occupancy is occurred by the United States have no say-so in their citizenship? Your Honor. Under the Treaty of Guadalupe Hidalgo, for example. I had my clerks do some research into these whole series of treaties for me. There, at the time the treaty was signed, there was a period of two years during which the citizens of the new territories could elect to be citizens or to elect the citizenship of the Republic of Mexico. So, they had a choice. Here, you're saying the citizens of the territories have, at the time of accession, have no choice. Your Honor, I have. That's a pretty harsh position to take, assuming they don't want citizenship. Your Honor, I have three responses to that. All right. A doctrinal one and then two that really get to the substance of your question. The doctrinal response is that the only pathway to reach the decision that my colleague, Mr. Williams, urges or that the D.C. Circuit held in Chihuahua is to conclude first that the own geographic scope. The United States and we agree that the Citizenship Clause defines its own geographic scope, and therefore, the incorporation framework does not apply. The only question is whether territories are part of the United States for purposes of the Citizenship Clause. That's why the government says at page 15 of its opening brief, the best reading of the clause is that it does not include any territory since 1868. That's the first point. So, you have to go through the incorporation doctrine, and you can't get there because the Citizenship Clause defines its own geographic scope. The second and more substantive point is that the central purpose of the Citizenship Clause was to remove the question of birthright citizenship from the realm of politics, and they had a very good reason for doing that, the Reconstruction Congress. We had just fought a war of unimaginable bloodshed, not just over two questions, who would be a citizen in our polity and whether dissenters could leave. And the Reconstruction Congress answered that in the Citizenship Clause, forever taking this out of the realm of politics. The highest purpose of the Citizenship Clause is to take all of the persons born or naturalized in the United States and bind them together as American citizens. The ebbs and flows of ongoing political debates in the territories simply cannot disturb that constitutional command. So, what we are left with here is the question of whether the Reconstruction Congress actually intended to... Well, let me ask you this. I want to talk about this case. Are you saying that, as of assuming that this decision is affirmed all the way up, that the citizens of Samoa are U.S. citizens? Are they dual citizens? Are they also citizens of Republic of Samoa? No, Your Honor. So, they lose all their... No, Your Honor. The territory of American Samoa has only allegiance to the United States. They are not part of any other country. And that is why I opened by saying what the government's position here is, is that Mr. Fitissimanu is a citizen of nowhere. He can only be... Because the deeds of session of American Samoa demand permanent allegiance to the United States, there is no other country involved here. This is purely a question of whether the Citizenship Clause and its term, United States, includes American Samoa and includes territories generally. And I want to say just a couple words about Wong Kim Ark, because I do think, as Judge Waddup said, Wong Kim Ark really does resolve this question. Wong Kim Ark, Section 5, supplies the for the conclusion that Wong Kim Ark was a birthright citizen. Section 5 of Wong Kim Ark proceeds in two steps. First, that the 14th Amendment enacted the common law rule that, except for Dred Scott, had prevailed since the founding, and Wong Kim Ark II did not fall into any exception to that rule. That is Section 5 of the Wong Kim Ark decision. The dispute between the majority and the dissent in Wong Kim Ark was not about the contents of the exception to the common law rule. It was whether the United States had ever adopted that common law rule. Let me ask you, I tried to find out the practical the wife being pregnant and the baby is born in Samoa, then the child is a resident of the, is a citizen of the United States. Is that correct? That is almost precise. If you accept my position that American Samoa is part of the United States, that is the holding of Wong Kim Ark. That is exactly the holding of Wong Kim Ark. It was aliens from China who were deemed by the temporarily. And the whole dispute between the majority and the dissent is whether the United States had ever enacted this common law principle, which came down from England, that even temporary sojourners, as they were called in Wong Kim Ark, would be the beneficiaries of birthright citizens. And the holding of Wong Kim Ark is that the United States, in the 14th Amendment, did embrace and enact and constitutionalize this common law rule from England. And that is why Wong Kim Ark won. So you cannot dismiss, as the United States does, and frankly, as other courts of appeals have done, this is dicta. The Supreme Court has held that the 14th Amendment includes and embraces and constitutionalizes the common law principle of birth within the dominion. And there is no dispute here that American Samoa is within that dominion. That is why Wong Kim Ark is controlling. I do want to say just a couple of other things in response to my colleagues from the other side. My friend from the government mentioned the Supreme Court's in Rabang. That case did not address the constitutionality, did not interpret the citizenship clause. It only addressed an interpretation of the statute. And that was recognized by both the Second Circuit in Valmonte and the Fifth Circuit in Nolos. So Rabang cannot be any basis for the decision here. The second thing I want to say is that the insular cases cannot be extended. The Supreme Court told us this in June, repeating something that had been said 65 years ago in Reed v. Covert. And the United States here is requesting that this court extend the insular cases to take it from, to take Downs v. Bidwell from the tax uniformity provision, tax uniformity clause, and extend that reasoning to the citizenship clause. But in doing that, I have to say that the United States is asking you to embrace the very most independent. It looks like we are frozen out. Mr. McGill, can you hear us? Raise your hand if you can. I'm sorry. You froze at least on my screen. Mine as well. Oh, that is a drag. Okay. So I will try again. So what I was, I was speaking about the insular cases, and I was saying, right. So they are asking you to embrace the very most indefensible aspects of the insular cases, that birthright citizenship could not possibly apply to people born on, quote, an unknown island peopled with an uncivilized race. That's page 306 of Justice White's opinion, which did not command a majority, but later becomes the basis for the incorporation doctrine. And that is at least part of the reason why the Supreme Court has cautioned time and again, do not extend these cases. And that's, I think, why the government really leads with the argument that we don't need the incorporation doctrine, because the clause, the citizenship clause defines its own scope. So you should not get to the incorporation doctrine. And if you do, you certainly shouldn't extend it as the United States is asking. Why don't you go ahead and give us your final thought, and then we'll turn it over to Rebuttal. I'll leave you with just one other thought. There is one more very strange result that would come from the United States' rule here. A person, it is that a person naturalized in the territories, as has happened repeatedly and happens all the time, including in Puerto Rico quite often today, would not be guaranteed citizenship in a state to which he or she later moves. If United States does not include the territories, then a person naturalized in the territories has no guarantee of citizenship in the state. That is plainly contrary to the purpose and indeed the very meaning of what the 14th Amendment was trying to do. Judge Schumer, may I ask one last question of counsel, Mr. McGill, and that is this. Mr. McGill, your position is, then I take it, the United States Congress has no role in the determination of the citizenship of the territories. Other than to decide whether to make a territory a territory, I think that is when it annexes a territory, that territory becomes part of the United States. And it would be illegal, then, for Congress to have any treaty that would provide otherwise. I think that the birthright citizen, I think it would be unconstitutional for Congress to withhold birthright citizenship. I don't think it would be a birthright citizenship in the United States. I don't think it would be unconstitutional at all for Congress to allow such persons to become dual citizens, as many statutes do allow. Thank you. Judge Back, do you have a final question? Thank you. All right. Let's go back to the United States. I'll give you three minutes, Mr. Henshelwood. I'm going to unmute myself. Thank you, Your Honor. I think it's important to step back. And my colleague just gave you sort of a series of hypotheticals and descriptions of the territories. But what my colleague didn't give you was any account of the longstanding practice with respect to the territories that has persisted since the late 1800s up to the present day. On my colleague's theory that was adopted by the district court, every person, as soon as the American flag went up in the Philippines, who was born in the Philippines was a U.S. citizen from the moment of their birth. They had no say in that. Congress had no ability to take that, to withhold that choice, regardless of whether the Filipinos wanted it or not. And in fact, my colleague has really not in his briefs given any explanation for how it is that those folks came to lose their citizenship, which no one realized they had. And I think it's instructive that when asked about the 18th Amendment, plaintiffs say, well, you know, that's because there was some doubt about whether territories were in the United States. But the point is that there was no doubt. Everyone recognized at that point that territories, particularly the unincorporated territories the United States possessed in the 1930s, were not in the United States. My colleague has pointed to no constitutional provision in which that phrase, the United States, or in the United States, throughout the United States, has been construed to apply to unincorporated territories. None. Hooven and Allison recognizes that for the Faction Informity Clause. You know, we have the consistent statements of Congress on this topic. All the courts of appeals that have addressed this question have all recognized that that language does not encompass, at a minimum, unincorporated territories. And I just want to come back briefly to this. There's been a lot of discussion about how this does or does not respect the wishes of the people of American Samoa or other territories. And the relevant point is that what the sort of unincorporated territories doctrine does in this context is it gives Congress flexibility and it gives Congress the authority to govern the different territories in different ways and to respect those traditions. And whatever the source of that doctrine, and there is no question that Downs contains language that we are certainly not here to defend, whatever the source of that doctrine, the present purpose that it serves is to enable Congress to respect those choices. And where you have the American Samoan government here expressing quite powerfully that they do not want to have citizenship sort of imposed on them without say, I think that's strong evidence that the courts of appeals that have consistently recognized that this, that the Philippines, for example, were not in the United States for the relevant purpose of the 14th Amendment or any other constitutional provision for that matter, and the D.C. Circuit specifically with respect to American Samoa, that those courts were correct in understanding that Wong Kim Ark doesn't resolve this question, that the Supreme Court does not, although it is cautioned against expanding the insular cases. What's happening here, recognizing that principle in no sense expands those cases. And if there are no further questions, Your Honor, I'll stop there. Thank you, counsel. Before we, before we break, I just want to compliment all of you on the quality of the written advocacy in this case, and certainly today's oral argument, and that also extends, I'm sure, to the many amici listening in today. We appreciate having the competing arguments laid out so ably. So thank you much. You, you are now excused. The case shall be submitted, and I'd ask the panel to stay on for a few minutes after we're done. Thank you. Thank you, Your Honor. Thank you, Your Honor. Can I call at 1230, or would you like a longer break? That would be good.